## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEW MEXICO

JON IRVIN LEVIN,

        Plaintiff,

vs.                                                                    No. CIV 05-629 JB/WDS

AIRGAS SOUTHWEST, INC.,

        Defendant.

## MEMORANDUM OPINION AND ORDER

**THIS MATTER** comes before the Court on Defendant Airgas Southwest, Inc.'s Motion for

Summary Judgment to Enforce Contractual Limitation of Liability, filed January 24, 2006 (Doc. 44).

The Court held a hearing on this motion on April 21, 2006.  The primary issue is whether courts in

the State of New Mexico would enforce the liability release in the contract between the parties.

Because Airgas has demonstrated that there is no genuine issue that the liability release should be

enforced, the Court will grant Airgas' motion for summary judgment.

## FACTUAL BACKGROUND

The following facts are not in dispute.  Plaintiff Jon Irvin Levin, a doctor, is fifty-three years

old.  See Deposition of Judy Levin at 9:16-17 (taken December 21, 2005)(hereinafter "Judy Levin

Depo.").  While there is no competent evidence in the record, the parties indicated that doctors use

liquid nitrogen to freeze or burn off tissue, such as warts, in their offices.  See Transcript of Hearing

at 14:17-18 (taken April 21, 2006).[1]  Levin has been using and handling liquid nitrogen since he was

eighteen years old, or over thirty-four years.  See Deposition of Jon Irvin Levin at 12:4-6 (taken

---

[1] The Court's citations to the transcript of the hearing refer to the Court Reporter's original, unedited version.  Any final transcript may contain slightly different page and/or line numbers.

December 21, 2005)(hereinafter "Jon Irvin Levin Depo.").

Levin purchased a dewar over ten years ago from an unknown welding/gas company in Hobbs, New Mexico.  See id. at 17:8-16.  Airgas delivered liquid nitrogen to Levin for years before February 10, 2004.  See id. at 15:8-14, 18:14-21.  Airgas does not supply the grade of liquid nitrogen it supplied to Levin to the general public.  See Affidavit of Cindy Grant ¶ 3, at 1 (executed January 13, 2006)(hereinafter "Grant Aff.").  Airgas supplies that grade of liquid nitrogen only to people who are licensed to practice medicine, ambulance companies, hospitals, and persons holding valid prescriptions.  See id.

Levin did not use the liquid nitrogen, which Airgas supplied, for personal, family, or household purposes; he used it for his business.  See Jon Irvin Levin Depo. at 18:14-19:3.  As of February 10, 2004, there were other suppliers of liquid nitrogen that Levin could have chosen over Airgas.  See id. at 21:10-20; Affidavit of Susan Fitch ¶ 3, at 1 (executed January 20, 2006)(hereinafter "Fitch Aff.").

Levin alleges that, on February 10, 2004, the valve on his liquid nitrogen tank blew off the top of the dewar, spewing liquid nitrogen onto his face and groin area.  See Second Amended Complaint ¶¶ 7, 8, at 2, filed September 14, 2005 (Doc. 19); Jon Irvin Levin Depo. at 14:12-21, 16:8-20, 64:1-18; Letter from Morris W. Holt, Director of FDA Operations, to Bryan J. Davis at 5 (dated January 25, 2006).  Airgas had refilled Levin's liquid nitrogen dewar a few days before this incident. See Jon Irvin Levin Depo. at 25:23-26:7; Judy Levin Depo. at 13:15-18.  Airgas invoiced Levin with each delivery of liquid nitrogen "99 percent of the time."  Judy Levin Depo. at 17:21-18:18.  Levin has seen and signed at least one of these invoices.  See Jon Levin Depo. at 26:20-27:16; Delivery Order Form at 1.

Levin is not aware of any contract between him and Airgas for it to render maintenance on his dewar. See Jon Irvin Levin Depo. at 15:8-16:5. The primary purpose of Airgas' relationship with Levin was the delivery of liquid nitrogen to him. See id. at 22:3-7.

Above the customer signature line on each Airgas invoice appears in all capital letters the statement "THIS AGREEMENT SUBJECT TO AIRGAS' STANDARD TERMS AND CONDITIONS. SEE REVERSE SIDE FOR IMPORTANT SAFETY INFORMATION." See Delivery Order Form at 1. The back of the invoice for each delivery of liquid nitrogen contained the "Terms and Conditions" referenced on the front of the Delivery Order Form. Paragraph 8 of the "Terms and Conditions" reads:

> Limitation of Liability: Supplier shall be liable only for the repair or replacement of defective gas cylinders and contents. Customer knowingly and fully assumes the risk of transporting and using compressed gases. In no event shall Supplier be liable for consequential damages. Supplier shall not be liable for any damages, direct, indirect, special, incidental, consequential or otherwise arising out of or in connection with any product referred to herein or the manufacture[,] packaging, delivery, storage or use of it, whether such damage shall result from negligence, breach of warranty or otherwise.

Id. at 2.

## PROCEDURAL BACKGROUND

Levin's Complaint alleges that Airgas "breached its duty to care for the Plaintiff in properly maintaining, servicing, and caring for the product in question to avoid injury to the Plaintiff" and that this negligence caused Levin's injuries. Second Amended Complaint ¶¶ 13-14, at 2-3. Airgas moves, pursuant to rule 56 of the Federal Rules of Civil Procedure, for summary judgment on Levin's claim, contending that there is no genuine issue that the terms and conditions of the contract between Levin and Airgas released Airgas from liability for negligence and that New Mexico law does not bar the

liability release.  See Defendant Airgas Southwest, Inc's Brief in Support of its Motion for Summary

Judgment to Enforce Contractual Limitation of Liability ("Summary Judgment Memorandum") at 5-

12, filed January 24, 2006 (Doc. 45).   Levin counters that the liability release is not clear or

unambiguous, and that the public interest weighs against enforcing it.   See In Errata Plaintiff's

Response to Defendant Airgas Southwest's Motion for Summary Judgment and Consolidated

Memorandum of Law ("Amended Response") at 6-15, filed February 23, 2006 (Doc. 54).  Pursuant

to D.N.M. LR-Civ. 7.1(a), Airgas certifies that it sought Levin's concurrence in this motion, but that

Levin does not concur in the motion.  See Motion for Summary Judgment at 1.

## STANDARD FOR DECIDING MOTIONS FOR SUMMARY JUDGMENT

Summary judgment shall be granted "if the pleadings, depositions, answers to interrogatories,

and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to

any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ.

P. 56(c).  See Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).  The opposing party may not rest

upon mere allegations and denials in the pleadings, but must set forth specific facts showing that there

is a genuine issue for trial.  See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)(citing

Fed. R. Civ. P. 56(e)).  An issue of fact is "genuine" if the evidence is significantly probative or more

than merely colorable, such that a jury could reasonably return a verdict for the non-moving party.

Id. at 249-50 (citations omitted).

Mere assertions or conjecture as to factual disputes are not enough to survive summary

judgment.  See Branson v. Price River Coal Co., 853 F.2d 768, 771-72 (10th Cir. 1988).  The Court

may only consider admissible evidence when ruling on a motion for summary judgment.  See World

of Sleep, Inc. v. La-Z-Boy Chair, Co., 756 F.2d 1467, 1474 (10th Cir. 1985)(citing Fed. R. Civ. P.

-4-

56(e)).

If a defendant seeks summary judgment, it has an "initial burden to show that there is an absence of evidence to support the nonmoving party's case." Munoz v. St. Mary-Corwin Hosp., 221 F.3d 1160, 1164 (10th Cir. 2000)(quoting Thomas v. IBM, 48 F.3d 478, 484 (10th Cir. 1995))(internal quotations omitted). Upon meeting that burden, the plaintiff must "identify specific facts that show the existence of a genuine issue of material fact." Id. (citations and internal quotations omitted). "The party opposing the motion must present sufficient evidence in specific, factual form for a jury to return a verdict in that party's favor." Id. (citations and internal quotations omitted).

The non-moving party must "go beyond the pleadings and by her own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial." Celotex Corp. v. Catrett, 477 U.S. at 324 (internal quotations omitted). The non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." Biester v. Midwest Health Servs., Inc., 77 F.3d 1264, 1266 (10th Cir. 1996)(citation and internal quotation marks omitted). Similarly, the non-moving party must demonstrate that something more than a "mere scintilla of evidence" supports the non-movant's position. Hom v. Squire, 81 F.3d 969, 973 (10th Cir. 1996)(citations omitted).

## ARTICLE 2 OF THE UNIFORM COMMERCIAL CODE

Although the Uniform Commercial Code ("UCC") and New Mexico statutory law provide that limitations of liability for consequential damages for personal injuries in transactions in consumer goods are prima facie unconscionable, this rule does not apply to a commercial transaction. See NMSA § 55-2-719(3) ("Limitation of consequential damages for injury to the person in the case of

consumer goods is prima facie unconscionable but limitation of damages where the loss is commercial

is not."). Article 2 of the UCC and New Mexico law sanction limitations of liability clauses in

commercial transaction for the sale of goods. See id. § 55-2-719. That section states, in relevant

part:

> (1) Subject to the provisions of Subsections (2) and (3) of this section and of the preceding section [55-2-718 NMSA 1978] on liquidation and limitation of damages:
>
> (a) the agreement may provide for remedies in addition to or in substitution for those provided in this article and may limit or alter the measure of damages recoverable under this article, as by limiting the buyer's remedies to return of the goods and repayment of the price or to repair and replacement of nonconforming goods or parts; and
>
> (b) resort to a remedy as provided is optional unless the remedy is expressly agreed to be exclusive, in which case it is the sole remedy.
>
> (2) Where circumstances cause an exclusive or limited remedy to fail of its essential purpose, remedy may be had as provided in this act [this chapter].
>
> (3) Consequential damages may be limited or excluded unless the limitation or exclusion is unconscionable. Limitation of consequential damages for injury to the person in the case of consumer goods is prima facie unconscionable but limitation of damages where the loss is commercial is not.

New Mexico follows the "primary purpose" test for determining whether the UCC governs a mixed

goods/services contract. See Kirkpartrick v. Introspect Healthcare Corp., 114 N.M. 706, 709-710,

845 P.2d 800, 803-804 (1992). Under the primary purpose test, the UCC applies if "the primary

purpose of the contract is to sell goods rather than to provide services." Id. at 709, 845 P.2d at 803.

New Mexico's UCC statute defines the term "conspicuous" as follows:

> "[C]onspicuous", with reference to a term, means so written, displayed or presented that a reasonable person against which it is to operate ought to have noticed it. Whether a term is "conspicuous" or not is a decision for the court. Conspicuous terms include the following:

(A) a heading in capitals equal to or greater in size than the surrounding text or in contrasting type, font or color to the surrounding text of the same or lesser size; and

(B) language in the body of a record or display in larger type than the surrounding text or in contrasting type, font or color to the surrounding text of the same size or set off from surrounding text of the same size by symbols or other marks that call attention to the language

N.M.S.A. § 55-1-201(b)(10).  In <u>Deaton, Inc. v. Aeroglide Corp.</u>, 99 N.M. 253, 657 P.2d 109 (1982), the Supreme Court of New Mexico explained that a term is conspicuous under the UCC statute if "it is so written that a reasonable person ought to have noticed it, and if it has a printed heading in capitals. . . .  Language which refers the reader to conditions or provisions on the reverse side of the form suffices to make the language referred to conspicuous." <u>Id.</u> at 256, 657 P.2d at 112.

## <u>NEW MEXICO LAW REGARDING LIMITATIONS ON LIABILITY</u>

In <u>Berlangieri v. Running Elk Corp.</u>, 134 N.M. 341, 76 P.3d 1098 (2003), the Supreme Court of New Mexico upheld the enforceability of liability releases, with "strict limits."  <u>Id.</u> at 349-50, 76 P.3d at 1106-07 (2003) ("We conclude the general rule that liability releases for personal injury may be enforced in limited circumstances should be retained.").  <u>Berlangieri v. Running Elk Corp.</u> involved a guest at a recreational resort facility who was injured while riding a horse.  <u>See id.</u> at 343-45, 76 P.3d at 1100-02.  The guest sued the facility for negligently placing the harness on the horse.  <u>See id.</u>  The state district court dismissed the case, because the liability release that the guest signed excluded liability for negligence.  <u>See id.</u> at 345, 76 P.3d at 1102.  The liability release stated:

The undersigned, being over the age of 18, (or if under the age of 18, through my natural parent or legal guardian) hereby agree with THE LODGE AT CHAMA.

I acknowledge that I have been informed of, and that I am otherwise aware of, the risks involved in fishing, horseback riding, hiking and shooting the sporting clays on the lands of THE LODGE AT CHAMA. I hereby declare that I possess sufficient

skills and experience in the above mentioned activities without causing injury to myself or other guests of THE LODGE AT CHAMA.

In consideration of being permitted to participate in the above mentioned activities and otherwise use the lands of THE LODGE AT CHAMA, I agree:

To use due care while engaging in the above mentioned activities on the lands of THE LODGE AT CHAMA, including, but not limited to, each and every risk resulting from negligent acts or omissions of any other person or persons, including employees and agents of THE LODGE AT CHAMA. I further agree to exculpate and relieve THE LODGE AT CHAMA and its employees, representatives and agents, from all liability for any loss, damage, or injury, whether to person or property which I may suffer while engaging in activities and/or using the lands of THE LODGE AT CHAMA all whether or not resulting from the negligent act or omission of another person or persons.

Id. at 344, 76 P.3d at 1101.

The Supreme Court noted that other courts have refused to uphold liability releases involving medical research and residential leases.  See id. at 350, 76 P.3d at 1107.  The Supreme Court approved, however, "several limiting factors that could operate to void an exculpatory agreement." Id.  The first factor is that liability releases are construed strictly against the drafter.  See id. (citation omitted).  Strict construction requires that the court "look to the specific language of the release to determine whether it is sufficiently clear and unambiguous that it would inform the person signing it of its meaning."  Id. (citations omitted).  The release "must be written to be understood by those without legal training."  Id.  "It is important that the release at issue in any particular case contain specific language informing the patron of the types of risks being assumed, regardless of whether the patron is well-versed in legal terms of art or not." Id. at 351, 76 P.3d at 1108 (citation omitted).  The court should consider the liability release's context to determine the release's meaning.  See id. ("Context is important; the words surrounding the portion being construed and the circumstances surrounding the agreement are relevant.").  In addition to the language of the release, courts should

"look to the placement of that language within the document to determine whether it is conspicuous enough." Id. at 352, 76 P.3d at 1109 (citation omitted). The language is conspicuous if "a reasonable person against whom a clause is to operate ought to have noticed it." Id. (citation and internal quotation marks omitted).

The second factor is "whether the release is affected with a public interest such that it is unenforceable as contrary to public policy." Id. (citation omitted). The Supreme Court of New Mexico has adopted "the non-exclusive list of factors from [Tunkl v. Regents of University of California, 60 Cal. 2d 92, 383 P.2d 441 (1963)] to determine whether public policy should operate to void the release." Id. The Supreme Court described the analysis under those factors:

> The attempted but invalid exemption involves a transaction which exhibits some or all of the following characteristics.
>
> [1] It concerns a business of a type generally thought suitable for public regulation.
>
> [2] The party seeking exculpation is engaged in performing a service of great importance to the public, which is often a matter of practical necessity for some members of the public.
>
> [3] The party holds himself [or herself] out as willing to perform this service for any member of the public who seeks it, or at least for any member coming within certain established standards.
>
> [4] As a result of the essential nature of the service, in the economic setting of the transaction, the party invoking exculpation possesses a decisive advantage of bargaining strength against any member of the public who seeks his [or her] services.
>
> [5] In exercising a superior bargaining power the party confronts the public with a standardized adhesion contract of exculpation, and makes no provision whereby a purchaser may pay additional reasonable fees and obtain protection against negligence.
>
> [6] Finally, as a result of the transaction, the person or property of the purchaser is placed under the control of the seller, subject to the risk of carelessness by the seller or his . . . agents.

Id. at 352-53, 76 P.3d at 1109-10 (citation and internal quotations omitted).  The Supreme Court

explained its belief that "it would be a rare case when a release exhibited all of these factors at once"

and eschewed a simple balancing test of these factors.  Id. at 353, 76 P.3d at 1110.  As the Supreme

Court stated, "[i]t would be possible that only one of these factors would be applicable, but that

factor would be significant enough to make the release unenforceable."  Id.  "These six factors are

only indicators that are helpful in determining the larger question of whether enforcement of the

release would be unjust."  Id.

**ANALYSIS**

The Court will grant Airgas' motion for summary judgment.  The liability release was clear

and unambiguous.  And the liability release is not contrary to public policy.

**I.     THE LIABILITY RELEASE IS CLEAR AND UNAMBIGUOUS.**

Airgas contends that the liability release in the invoice that Levin signed exculpates it from

liability for negligence for the damages that Levin allegedly suffered when the dewar spewed liquid

nitrogen onto Levin.  See Summary Judgment Memorandum at 12.  Because Airgas cannot be held

liable for Levin's damages, Airgas argues that there are no genuine issues of material fact and that

it is entitled to summary judgment as a matter of law.  See id.  Levin responds that the liability release

is not clear and unambiguous and violates public policy.  See Amended Response at 6-15.

At the outset, the Court notes that the parties agree that the UCC applies to the contract

between the parties.  See Transcript of Hearing at 9:10-10:11.  New Mexico's UCC statute addresses

limitations of liability for consequential damages: "Limitation of consequential damages for injury to

the person in the case of consumer goods is prima facie unconscionable but limitation of damages

where the loss is commercial is not."  NMSA § 55-2-719(3).  The UCC makes a distinction between

limitations of liability for damages for personal injury in consumer goods transactions -- which are prima facie unconscionable -- and limitations of liability for commercial losses, which are not prima facie unconscionable.  See id.  This case does not fall squarely into either provision, because Levin is claiming damages for personal injuries in a commercial, not consumer goods, transaction.  Because § 55-2-719(3) does not apply to the facts of this case, the Court must look elsewhere for a controlling standard.

The parties also agree that the Supreme Court of New Mexico's decision in Berlangieri v. Running Elk Corp. controls the outcome in this case and that the Court should follow Berlangieri v. Running Elk Corp. in resolving this case.  See generally Transcript of Hearing at 9:10-10:11, 19:18-24.  Berlangieri v. Running Elk Corp. involved a transaction between an individual customer and a business, and this case involves a transaction between two businesses.  An argument could be made that, under the UCC, the Running Elk factors should not apply to transactions between businesses.  The UCC generally makes liability releases presumptively unconscionable in consumer transactions and liability releases presumptively valid in business transactions.  An argument could be made that the Running Elk factors – largely developed in the context of consumer transactions – should not be used to invalidate liability releases in business transactions.

Berlangieri v. Running Elk Corp. did not, however, limit itself to the former situation and eschewed attempts to distinguish between liability release cases.  See generally 134 N.M. at 343-356, 76 P.3d at 1100, 1113 ("The appellate courts of this state have generally held that agreements that exculpate one party from liability for negligence will be enforced, unless they are violative of law or contrary to some rule of public policy. The Court of Appeals majority is correct to point out, however, that each time this Court has applied the rule, it has been in the context of purely economic

damages, rather than personal injury. . . . Although previous cases . . . involved releases for damages
due to economic injuries arising out of different contexts than the recreational industry, the cases
never perceived such a distinction as relevant."). The federal court is bound to follow New Mexico
law, and Berlangieri v. Running Elk Corp. suggests that the Supreme Court of New Mexico, if faced
with the issue before the Court, would apply the Running Elk factors to a transaction between two
businesses. The Court will, therefore, follow the path outlined by Berlangieri v. Running Elk Corp.
in determining whether the liability release is valid. Nevertheless, that this transaction before the
Court is one between two businesses, and how the UCC treats said transaction differently from
consumer transactions, should inform the application of the Running Elk factors in this case involving
a business transaction.

Berlangieri v. Running Elk Corp. began by expressing the general rule that liability releases
for personal injury may be enforced in limited circumstances. See id. at 350, 76 P.3d at 1107. The
Supreme Court of New Mexico has identified two factors that limit the enforcement of liability
releases. See id. The first limiting factor is that a liability release is strictly construed against the
drafter; the liability release must be sufficiently clear and unambiguous such that it would inform the
person signing it of its meaning. See id. The liability release must be written so that it can be
understood by those without legal training. Id. When examining whether the liability release is clear
and unambiguous, the Court should examine the context in which the liability release's language
appears and the conspicuousness of the liability release. See id. at 351-52, 76 P.3d at 1108-09.

The liability release in this case is sufficiently clear and unambiguous such that it would inform
the person signing it of its meaning, even if the person signing it does not have legal training. The
last sentence of the liability release is an alarm bell to customers that Airgas cannot be held liable for

-12-

negligence: "Supplier shall not be liable for any damages, direct, indirect, special, incidental, consequential or otherwise arising out of or in connection with any product referred to herein or the manufacture[,] packaging, delivery, storage or use of it, whether such damage shall result from negligence, breach of warranty or otherwise."   Delivery Order Form at 2.   The first clause of this sentence confronts the reader with the key point in the liability release – that Airgas will not be liable for *any damages* – even before the lay reader encounters legal terms like "direct," "special," "incidental," or "consequential."   Id.   The release lays out, in non-legal language, the activities upon which liability for any damages will not ensue: manufacturing, packaging, delivery, storage, or use of the liquid nitrogen.   See id.   Finally, the liability release explains that an injured party cannot recover damages even if they result from negligence.   See id.

Further, the language is more clear than the liability release that the Supreme Court of New Mexico upheld as clear and unambiguous in Berlangieri v. Running Elk Corp., which stated:

> I further agree to exculpate and relieve THE LODGE AT CHAMA and its employees, representatives and agents, from all liability for any loss, damage, or injury, whether to person or property which I may suffer while engaging in activities and/or using the lands of THE LODGE AT CHAMA all whether or not resulting from the negligent act or omission of another person or persons.

134 N.M. at 351, 76 P.3d at 1108.   The Supreme Court conceded that "this sentence could have been more artfully or clearly drafted."   Id.   The New Mexico Supreme Court concluded, however, that the sentence's core stated: "I . . . relieve THE LODGE . . . from all liability for . . . injury . . . resulting from the negligent act . . . of another . . . ."   Id. at 352, 76 P.3d at 1109.   The Supreme Court reasoned that, "[o]n balance, it has only one reasonable interpretation: it is an agreement not to sue the Lodge for injuries caused by the negligence of Lodge employees."   Id.

Unlike the Supreme Court in Berlangieri v. Running Elk, the Court does not have to slice and

-13-

dice this case's liability release to comprehend its meaning.  The first eight words of the key sentence forcefully convey the import of the liability release: "Supplier shall not be liable for *any damages*. . . ."  Delivery Order Form at 2 (emphasis added).  The liability release's meaning is more apparent than in <u>Berlangieri v. Running Elk</u>, because the reader does not have to pick out and disregard extraneous words and phrases – like "exculpate," "employees, representatives and agents," "loss," "damage,"  "whether to person or property," or "omission" –  to arrive at the liability release's message.  Instead, this case's liability release says what it means: Airgas shall not be liable for any damages.

To demonstrate that the liability release was not clear and unambiguous, Levin takes the Court line by line through the release highlighting what he believes to be ambiguities in the agreement. <u>See</u> Amended Response at 6-8.  Levin first points to the beginning sentence of the liability release: "Supplier shall be liable only for the repair or replacement of defective gas cylinders and contents." From this sentence, Levin reaches to the conclusion that Airgas therefore had a duty to inspect the dewar when Airgas delivered the liquid nitrogen and that Airgas' failure to do so breached that duty. <u>See</u> <u>id.</u> at 6.  For Levin's interpretation to be correct, however, one has to read into the sentence the words "inspect" and "duty" where those words are not present.  If the parties had intended to impose such a duty on Airgas, then they could have expressed that desire by inserting those two words into the sentence.  Instead, read in conjunction with the fourth sentence, the first sentence of the liability release limits Airgas' liability to liquidated damages for the repair and replacement of defective gas cylinders, while excluding liability for any damages resulting from negligence during delivery of the liquid nitrogen.  The two terms work together without the need to imply a duty to inspect the dewar and, contrary to Levin's assertion, without creating a conflict between the two sentences.  Where the

parties have declined in the first place to place such a term in the liability release, the Court should not edit the document to include it.  Morever, even if Airgas had agreed, in the liability release's first sentence, that it had a duty to inspect the dewar during delivery, the fourth sentence still would limit Airgas' liability, because the fourth sentence states that it will not be liable for any damages resulting from negligence during delivery of the liquid nitrogen.

Levin attacks the next two sentences for not clearly expressing their meaning.  The second sentence states: "Customer knowingly and fully assumes the risk of transporting and using compressed gases."  As the Supreme Court of New Mexico stated, "'assumption of risk' is one of those legal phrases that one would not expect a lay person to understand, and would not be sufficient on its own to uphold the release."  Berlangieri v. Running Elk Corp., 134 N.M. at 352, 76 P.3d at 1109.  The Supreme Court of New Mexico nonetheless described the phrase as a "helpful signal" when placed in the title of a document.  Id.  Levin argues that "assumption of risk" does not serve as a helpful signal in this case because it appears halfway through the second sentence of the liability release instead of in the title of the document.  See Amended Response at 6-7.  Furthermore, Levin asserts that "assumes the risk" modifies only the transportation and use of compressed gases, but not the refilling of the dewar.  Id.  As for the third sentence – "In no event shall Supplier be liable for consequential damages" – Levin contends that the phrase "consequential damages" is not clear to a non-lawyer.  Id. at 7.

While Levin correctly notes that, unlike in Berlangieri v. Running Elk Corp., "assumption of risk" does not appear in the title of the document, the title of the liability release is "Limitation of Liability."  Delivery Order Form at 2.  The phrase "Limitation of Liability" is more easily understandable by a lay reader than assumption of risk, because the former expresses directly what

the latter expresses only indirectly; "Limitation of Liability" conveys that what follows will limit liability, whereas assumption of risk requires the reader to know that, when a plaintiff assumes the risk, the defendant's liability is limited as a result.  Turning to the third sentence, Levin admits in his Amended Response that he is not seeking consequential damages, and so that sentence is inapplicable in this case.  See Amended Response at 7.

Even if the first, second, and third sentences were not clear and unambiguous, the fourth sentence clearly and unambiguously represents that Airgas will not be liable for any damages, including from negligence.  See Delivery Order Form at 2.  The liability release in Berlangieri v. Running Elk Corp. survived because the sixth sentence communicated the liability release's meaning even though the other five sentences contained "unintelligible and unhelpful language."  134 N.M. at 344, 351, 76 P.3d at 1101, 1108.  Similarly, even if the first, second, and third sentences of the liability release in this case did not clearly disclose the liability release's meaning, as explained above, the fourth sentence informs the reader that the invoice limits Airgas' liability.

Levin next targets the fourth sentence, arguing that it does not make clear that Airgas is disclaiming liability for its negligence and that the word "negligence" appears "late in the sentence and far from its subject."  Amended Response at 7-8.  Yet the first eight words of the fourth sentence make clear that Airgas "shall not be liable for *any* damages," which would include damages from its own actions.  Discovery Order Form at 2 (emphasis added).  While "negligence" appears at the tail end of the sentence, the word "negligence" comes only forty-three words after the subject; in contrast, the Supreme Court upheld the liability release in Berlangieri v. Running Elk Corp. even though the word "negligent" appeared *fifty-six* words after the subject.  134 N.M. at 351, 76 P.3d at 1108.  It takes less work to reach "negligence" in the fourth sentence in this case than it did in

-16-

Berlangieri v. Running Elk Corp., and Berlangieri v. Running Elk Corp. demonstrates that a liability release can be clear and unambiguous even if the word "negligence" does not show up until late in the sentence.

Levin also asserts that the meaning of the word "delivery" is ambiguous and that the fourth sentence's limitation of liability for negligence during the delivery of the liquid nitrogen does not include negligence during the refilling of the dewar; Levin's reasoning is that the act of delivery does not include the act of refilling. See Amended Response at 8. To support his argument, Levin cites to the American Heritage Dictionary of the English Language for the proposition that delivery means "[t]o bring or transport to the proper place or recipient; distribute: *deliver groceries; deliver the mail*." Yet Levin does not explain the distinction between delivery and refilling, for just as a mailman delivers mail to a mailbox, so too would a supplier of liquid nitrogen deliver the gas to a dewar that preserved its liquid state. Nor does Levin suggest what delivery means if it does not include the act of filling a mailbox or refilling a liquid nitrogen dewar.

The Supreme Court of New Mexico also instructs courts to look to the placement of the liability release's language within the document to determine whether it is conspicuous enough. Berlangieri v. Running Elk Corp., 134 N.M. at 352, 76 P.3d at 1109 (citation omitted). The language is conspicuous if a reasonable person against whom a clause is to operate ought to have noticed it. Id. (citation and internal quotation marks omitted). Similarly, Deaton, Inc. v. Aeroglide Corp. defined a conspicuous terms as one "so written that a reasonable person ought to have noticed it, and if it has a printed heading in capitals. . . . Language which refers the reader to conditions or provisions on the reverse side of the form suffices to make the language referred to conspicuous." Deaton, Inc. v. Aeroglide Corp., 99 N.M. at 256, 657 P.2d at 112.

-17-

The liability release in this case is conspicuous, because a reasonable person ought to have noticed it.  In capital letters just above the signature line, the following appears in capital letters: "THIS AGREEMENT SUBJECT TO AIRGAS' STANDARD TERMS AND CONDITIONS.  SEE REVERSE SIDE FOR IMPORTANT SAFETY INFORMATION."   Delivery Order Form at 1. Because the context of this language is that it is directly above the signature line and in all capital letters, a reasonable person ought to have seen it before signing.   Following the first page's admonition to look on the back, a reasonable person would notice that the eighth paragraph is titled "Limitation of Liability."  <u>Id.</u> at 2.  Although the liability release's language is not itself in capital letters, the heading on the front page advising the reader to look on the reverse side is in capital letters, and the Supreme Court of New Mexico has held that language which refers the reader to conditions or provisions on the reverse side of the form, such as here, suffices to make conspicuous the referenced language.  <u>See</u> <u>Deaton, Inc. v. Aeroglide Corp.</u>, 99 N.M. at 256, 657 P.2d at 112.

In fact, the liability release in this case closely resembles the implied warranty disclaimer in <u>Deaton, Inc. v. Aeroglide Corp.</u> that the New Mexico Supreme Court found to be conspicuous.  At the top of the description section of the contract, the following words appeared: "SUBJECT TO ALL THE CONDITIONS PRINTED ON THE BACK OF THIS SHEET, AEROGLIDE CORPORATION SHALL SELL AND THE UNDERSIGNED SHALL BUY THE FOLLOWING." 99 N.M. at 255; 657 P.2d at 111.  The reverse side of the document contained ten paragraphs of conditions in the same type and size -- uncapitalized.  <u>See id.</u>  One of those paragraphs acted as a warranty disclaimer: "There shall be no implied warranty of merchantability or of fitness for a particular purpose or use. No other warranties shall be recognized unless expressed in writing and signed by an officer of the seller."  <u>Id.</u> at 256; 657 P.2d at 112.  The Supreme Court concluded that

the disclaimer was conspicuous, because "the reference to the disclaimer was printed in capitals" and the language on the front of the document referring the reader to the conditions on the reverse side sufficed to make the disclaimer conspicuous.  Id.

Like the contract in Deaton, Inc. v. Aeroglide Corp., the invoice in this case came with a warning on the front page in capital letters that it was subject to conditions on the back of the document.  See Delivery Order Form at 1.  The terms and conditions on the back side were all in lower and upper case and in the same font, like in Deaton, Inc. v. Aeroglide Corp., except for the word "WARNING" in the seventh paragraph and the first sentence in the ninth paragraph, which was in capital letters.  Id. at 2.  Even if these two minor exceptions were enough to distinguish this case from Deaton, Inc. v. Aeroglide Corp., the liability release in this case was titled "Limitation of Liability," while none of the other paragraphs came with a title, strengthening the conspicuous nature of the liability release in this case.  Id.  The liability release in this case was titled, making it more conspicuous than the disclaimer in Deaton, Inc. v. Aeroglide Corp., which appears to have been untitled.  99 N.M. at 256; 657 P.2d at 112.[2]

It is unclear what role the UCC statute plays in New Mexico courts' analysis of liability

_____

[2] Deaton, Inc. v. Aeroglide Corp. does not affirmatively state that the warning on the front page was in capital letters and the disclaimer on the back page was in lower and upper case letters. See 99 N.M. at 255-56; 657 P.2d at 111-12.  There was some dispute about this point at the hearing. See Transcript of Hearing at 6:12-15,12:2-16.  The Supreme Court, however, made sure to quote the language on the front page in all capital letters, and the language on the back side in lower and upper case letters.  See Deaton, Inc. v. Aeroglide Corp., 99 N.M. at 255-56; 657 P.2d at 111-12. The Court will not second guess whether the Supreme Court accurately portrayed the typeface of the language it quoted in its opinion, or elevate a fact to importance that the Supreme Court did not. Similarly, the Supreme Court did not affirmatively state that the disclaimer was untitled, but it did not include a title in its quotation of the disclaimer; the Court will not question that the New Mexico Supreme Court quoted the language correctly, or emphasize a possible distinguishing factor that the Supreme Court did not.  See id. at 256; 657 P.2d at 112.

releases.  The statute defines the term "conspicuous" as follows:

> "[C]onspicuous", with reference to a term, means so written, displayed or presented that a reasonable person against which it is to operate ought to have noticed it. Whether a term is "conspicuous" or not is a decision for the court. Conspicuous terms include the following:
>
> > (A) a heading in capitals equal to or greater in size than the surrounding text or in contrasting type, font or color to the surrounding text of the same or lesser size; and
>
> > (B) language in the body of a record or display in larger type than the surrounding text or in contrasting type, font or color to the surrounding text of the same size or set off from surrounding text of the same size by symbols or other marks that call attention to the language

N.M.S.A. § 55-1-201(b)(10).  The Supreme Court applied this statute in Deaton, Inc. v. Aeroglide Corp., but determined that § 55-1-201(10) "provides that a term is conspicuous if it is so written that a reasonable person ought to have noticed it, and if it has a printed heading in capitals."  99 N.M. at 256; 657 P.2d at 112.  Deaton, Inc. v. Aeroglide Corp. did not mention subsections A and B.  See id.  Berlangieri v. Running Elk Corp. gave a more truncated definition of conspicuous, holding that a term is conspicuous if a reasonable person against whom a clause is to operate ought to have noticed it.  See 134 N.M. at 352, 76 P.3d at 1109.

The parties do not dispute that the UCC applies to this case.  See Transcript of Hearing at 9:10-10:11.  To the extent that the UCC controls the outcome of this analysis, the Court finds that the liability release is conspicuous under § 55-1-201(b)(10).  The Court has already explained why a reasonable person ought to have noticed the liability release.  Furthermore, the warning on the invoice's front page is in capitals equal to or greater in size than the surrounding text.  See N.M.S.A. § 55-1-201(b)(10)(A); Delivery Order Form at 1.  On the reverse side, the liability release's title, "Limitation of Liability," is set off from surrounding text of the same size by a colon, thereby calling

-20-

attention to the fact that this paragraph, unlike the other paragraphs on the reverse side, is important enough to merit a title and therefore careful reading.  <u>See</u> N.M.S.A. § 55-1-201(b)(10)(B); Delivery Order Form at 2.

Levin objects that <u>Deaton, Inc. v. Aeroglide Corp.</u> is not an appropriate case with which to compare this case because the former involved the disclaimer of warranties under the UCC, whereas this case involves the disclaimer of negligence liability.  <u>See</u> Amended Response at 10.  Yet Levin agreed at the hearing that the UCC applied to this transaction.  <u>See</u> Transcript of Hearing at 9:10-10:11.  Furthermore, both this case and <u>Deaton, Inc. v. Aeroglide Corp.</u> involved whether a term was conspicuous under the UCC; <u>Deaton, Inc. v. Aeroglide Corp.</u> did not rest its conclusion on the fact that it was an implied warranty case.  <u>See</u> 99 N.M. at 256; 657 P.2d at 112.

Levin also contends that a key fact is missing from this case that was present in <u>Berlangieri v. Running Elk Corp.</u>: the defendant in the latter case "made some effort to bring the release to [the plaintiff's] attention before signing it."  134 N.M. at 352; 76 P.3d at 1109.  Levin has not, however, introduced specific evidence to support this distinction.  To establish that Airgas did not point out the liability release to him before he signed it, Levin highlights the portion of his deposition testimony where he states that "no one specifically dealt with" Airgas when it made its deliveries; according to Levin, Airgas employees "would just come in the office, pick up the tank, go out to their truck and fill it and bring the tank back where they got it."  Jon Irvin Levin Depo. at 26:13-16.  Levin does not specifically state that Airgas never attempted to flag the liability release for his attention.  <u>See</u> <u>generally</u> <u>id.</u>

Even if one could make a reasonable inference from this testimony that Airgas never attempted to point out the liability release to Levin, <u>Berlangieri v. Running Elk Corp.</u> did not hold

that one of the defendant's agents *must* make some effort, beyond making the liability release's language clear and unambiguous and conspicuous, to bring the liability release to the other party's attention.  Instead, <u>Berlangieri v. Running Elk Corp.</u> found that the defendant's efforts to bring the liability release to the plaintiff's attention contributed to the conclusion that a reasonable person ought to have noticed the liability release in that case.  <u>See</u> 134 N.M. at 352; 76 P.3d at 1109.  In this case, for the reasons stated above, a reasonable person should have noticed Airgas' liability release, even if Airgas did not attempt to bring it to Levin's specific attention.

## II.       <u>THE LIABILITY RELEASE IS NOT CONTRARY TO PUBLIC POLICY</u>.

In addition to determining whether the liability release is clear and unambiguous, the Court must also decide whether the liability release is affected with a public interest such that it is unenforceable as contrary to public policy.  <u>See</u> <u>id.</u> at 352, 76 P.3d at 1109.  The Supreme Court of New Mexico has adopted the non-exclusive list of factors from <u>Tunkl v. Regents of University of California</u> to determine whether public policy should operate to void the release.  <u>See</u> <u>id.</u>  The Court must examine whether the liability release involves a transaction which exhibits some or all of the specified characteristics.  <u>See</u> <u>id.</u> at 352-53, 76 P.3d at 1109-10.

The first factor is that the liability release concerns a business of a type generally thought suitable for public regulation.  In its brief, Airgas relies on the fact that the UCC generally allows for limitations of liability for personal injuries in commercial transactions to argue that the business of liquid nitrogen is not a type generally thought suitable for public regulation.  <u>See</u> Summary Judgment Memorandum at 8-10.  While the UCC may generally smile on liability releases for personal injuries in commercial transactions, this does not mean that New Mexico does not frown on them in the particular context of the sale of liquid nitrogen.  By itself, the general provisions of the UCC tell the

Court little, if anything, about whether the sale of liquid nitrogen is generally thought suitable for public regulation.

At the hearing, Airgas argued that there is no New Mexico law that expresses the state's concern to regulate this business.  <u>See</u> Transcript of Hearing at 16:19-21, 18:4-20.  The Court's independent research has borne out the paucity of New Mexico law dealing with the sale of liquid nitrogen.  "Liquid nitrogen" appears only once in New Mexico cases -- as part of a case name in a cite to a District of Delaware decision -- and only once in New Mexico statutes -- as part of an explanation that freeze branding must be done with liquid nitrogen.  <u>See</u> <u>United Nuclear Corp. v. General Atomic Co.</u>, 96 N.M. 155, 174 n.25, 629 P.2d 231, 250 n.25 (1980); N.M.S.A. § 77-9-3(D).  Similarly, the New Mexico Court of Appeals found that the escrow business was not generally thought suitable for public regulation, because the parties did not point out any regulation of the escrow business in New Mexico and the Court of Appeals found only two references to the escrow business in New Mexico statutes.  <u>See</u> <u>Lynch v. Santa Fe Nat'l Bank</u>, 97 N.M. 554, 560, 627 P.2d 1247, 1253 (Ct. App. 1981).

Levin attempts to show that the sale of liquid nitrogen is generally thought to be suitable for public regulation through what he alleges are industry guidelines by the Compressed Gas Association ("CGA") and various federal regulations.  <u>See</u> Amended Response at 3-4, 12.  As Airgas correctly points out, however, Levin has not attempted to authenticate the CGA guidelines and therefore the Court cannot consider them on summary judgment.[3]  <u>See</u> 11 <u>Moore's</u> <u>Federal</u> <u>Practice</u> 56.14(2)(c)

---

[3] It is unclear whether Levin can even use the CGA Guidelines in this case.  The title page of the Guidelines reads: "This document licensed for the sole use of the purchaser.  It may not be shared with any other person or used after the expiration date without the express written permission of the CGA.  Any unauthorized use, reproduction, distribution, or modification of this printed page will result in a $5,000 liquidated damages fee plus loss of access to CGA publications for one year for

("Unauthenticated documents, once challenged, cannot be considered by a court in determining a summary judgment motion."); Ortiz v. Wingard, 173 F. Supp. 2d 1155, 1163 (D.N.M. 2001) (Smith, M.J.)("To be admissible, documents must be authenticated by and attached to an affidavit that meets the requirements of Rule 56(e) and the affiant must be a person through whom the exhibits could be admitted into evidence."); Flor v. O'Leary, No. CIV 93-1343, 1996 U.S. Dist. LEXIS 21787, at *11 (D.N.M. 1996)(Conway, C.J.)("For documents to be admissible for consideration on summary judgment, the offering party must properly authenticate the document and attach it to an affidavit that meets the requirements of Rule 56(e)."). The CGA Guidelines do not fall into one of the types of self-authenticating documents in rule 902 of the Federal Rules of Evidence. Also, the CGA Guidelines note that "[t]his document should not be confused with federal, state, provincial, or municipal specifications or regulations; insurance requirements; or national safety codes." Filling of Industrial and Medical Nonflammable Compressed Gas Cylinders at ii. The CGA Guidelines themselves, therefore, discourage readers from confusing the Guidelines with regulations.

Levin also gives a general cite to § 180 of title 49 of the Code of Federal Regulations and §§ 311-12 of the Superfund Amendment and Reauthorization Act of 1986 for federal regulations dealing with hazardous chemicals. See Amended Response at 12. Levin does not explain, however, how the sale of liquid nitrogen is regulated, or whether such regulations apply to the transaction at issue in this case. See id. Even so, as Airgas explains, these regulations only apply to transaction taking place in interstate commerce and there is no allegation that this case involved interstate commerce. See 49 U.S.C. § 5102(1). Also, the Material Safety Data Sheet that Levin attaches repeatedly indicates the

---

your company." Filling of Industrial and Medical Nonflammable Compressed Gas Cylinders (Title Page).

non-regulation of liquid nitrogen: (i) the CERCLA reportable quantity is listed as "None"; (ii) "Nitrogen is not listed as an Extremely Hazardous Substance" under the Superfund Amendment and Reauthorization Act of 1986; (iii) "Nitrogen is not listed as a toxic chemical" under the Superfund Amendment and Reauthorization Act of 1986; (iv) "Nitrogen is not listed as a regulated substance" under the Toxic Substance Control Act; and (v) "Nitrogen is not listed as a Highly Hazardous Chemical" under Occupational Safety and Health Administration regulations. Material Safety Data Sheet at 5-6. In the end, there is not much support for the notion that Airgas' business is a type generally thought suitable for public regulation. While the words "gas" and "chemicals" might suggest public regulation, certain gases – like helium – are available at party stores and steam is used at cleaners and in homes. The analysis needs to focus on the particular gas or chemical, and there is not much evidence of regulation of this product.

The second factor is that the party seeking exculpation is engaged in performing a service of great importance to the public, which is often a matter of practical necessity for some members of the public. Berlangieri v. Running Elk Corp., 134 N.M. at 352-53, 76 P.3d at 1109-10. There is no indication that New Mexico would find that a seller of liquid nitrogen is performing a service of great importance to the public. New Mexico has recognized only one service that fulfills such a role: public utilities. See id. at 356, 76 P.3d at 1113. The Supreme Court of New Mexico explained that to allow public utilities to contractually limit their liability "would put the individual or corporation using and paying for its power at the mercy of the public service corporation." Southwestern Pub. Serv. Co. v. Artesia Alfalfa Growers' Ass'n, 67 N.M. 108, 119, 353 P.2d 62, 69 (1960). There is no evidence that liquid nitrogen is a practical necessity for the population that is equal to electricity or water. While Levin argues that liquid nitrogen's use in medical treatment "is of great importance to the

-25-

public," Levin does not explain why this need is so and gives no facts about how necessary liquid nitrogen is to medical treatment. Amended Response at 12-13. The only fact in the record on this point is Levin's counsel's representation that liquid nitrogen is used for "things of a minor nature," mainly tissue removal, which does not appear to rise to a practical necessity like electricity or water. Transcript of Hearing at 14:17-18.

The third factor is that the party holds itself out as willing to perform this service for any member of the public who seeks it, or at least for any member coming within certain established standards. See Berlangieri v. Running Elk Corp., 134 N.M. at 352-53, 76 P.3d at 1109-10. Airgas does not sell liquid nitrogen to any member of the general public who seeks it, or to any member of the public coming within certain established standards; instead, Airgas sells it only to people who are licensed to practice medicine, ambulance companies, hospitals, and persons holding valid prescriptions. See Grant Aff. ¶ 3, at 1. Airgas requires more than the recreational lodge in Berlangieri v. Running Elk Corp., which did not limit those who could ride horses to experienced horse riders. See 134 N.M. at 356, 76 P.3d at 1113. This factor, therefore, goes in favor of upholding the liability release in this case.

Neither party argues that the fourth factor applies in this case. The fifth factor is that, in exercising a superior bargaining power, the party confronts the public with a standardized adhesion contract of exculpation, and makes no provision whereby a purchaser may pay additional reasonable fees and obtain protection against negligence. See id. at 352-53, 76 P.3d at 1109-10. In Berlangieri v. Running Elk Corp., the Supreme Court found that this factor weighed in favor the release, because the plaintiff "was not forced to enter the contract to participate in a recreational enterprise with Running Elk." Id. at 356, 76 P.3d at 1113. Similarly, there is no evidence that Airgas compelled

-26-

Levin to buy liquid nitrogen from it.  Nor, given the availability of other suppliers of liquid nitrogen that Levin could have chosen over Airgas, is there evidence that Levin was forced by necessity to buy from Airgas.  See Jon Irvin Levin Depo. at 21:10-20; Finch Aff. ¶ 3, at 1.  While Levin asserts that he could not pay additional reasonable fees and thereby obtain protection against negligence, he does not cite to any evidence to support that statement.  This factor weighs in favor the release.

The final factor is that, as a result of the transaction, the person or property of the purchaser is placed under the control of the seller, subject to the risk of carelessness by the seller or his agents.  See Berlangieri v. Running Elk Corp., 134 N.M. at 352-53, 76 P.3d at 1109-10.  While Levin had over thirty-four years experience handling and using liquid nitrogen, Levin also stated that  he merely "assumed" that it had a valve to protect against a buildup of pressure.  See Jon Irvin Levin Depo. at 19:23-20:1.  This factor, therefore, points neither way on the liability release.

The Court finds that factors one, two, three, and five weigh in favor of the liability release, and that factor six is neutral.  None of the factors so significantly weigh against enforcing the liability release that the Court should disregard the weight of the factors that do weigh in favor of the liability release.  Because Airgas has therefore demonstrated that there is no genuine issue that the liability release should be enforced, the Court will grant Airgas' motion for summary judgment.

**IT IS ORDERED** that Defendant Airgas Southwest, Inc.'s Motion for Summary Judgment to Enforce Contractual Limitation of Liability is granted.

_____
UNITED STATES DISTRICT JUDGE

*Counsel:*

Max Houston Proctor
Hobbs, New Mexico

– and –

Michael T. Newell
Heidel, Samberson, Newell, Cox & McMahon
Lovington, New Mexico

      *Attorneys for the Plaintiff*

Jeffrey M. Croasdell
Bryan J. Davis
Rodey, Dickason, Sloan, Akin & Robb, P.A.
Albuquerque, New Mexico

      *Attorneys for the Defendant*